**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **TRENCH TECH INTERNATIONAL, INC.** | § | |
| **and TRENCH-TECH, LTD.** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:19-cv-00201-O** |
| | § | |
| **TECH CON TRENCHING, INC.,** | § | |
| **DAVID W. CONLON, JEREMY GILBERT** | § | |
| **d/b/a GILBERT CONSULTING AND** | § | |
| **DESIGN FIRM, JACK SMITH,** | § | |
| **CTS MANUFACTURING, LLC, and** | § | |
| **GREEN MACHINE & TOOL, INC.** | § | |
| | § | |
| **Defendants** | | |

## PLAINTIFFS' THIRD AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Trench Tech International, Inc. and Trench-Tech, Ltd. file this Third Amended Complaint against Defendants Tech Con Trenching, Inc., David W. Conlon, Jack Smith, CTS Manufacturing, LLC, and Green Machine & Tool, Inc.,[1] and for causes of action respectfully show the Court the following:

**I.**
**PARTIES**

1.      Plaintiff Trench Tech International, Inc. ("Trench Tech International") is a Texas corporation with its principal place of business located in Roanoke, Denton County, Texas.

2.      Plaintiff Trench-Tech, Ltd. is a Texas limited partnership with its principal place of business located in Roanoke, Denton County, Texas.

---

[1] The claims against former defendants Nelson Lewis, Inc. and Diamond H. Trenching, Inc. were dismissed for lack of supplemental jurisdiction, and those two defendants have been sued in Texas state court.

3.      Defendant Tech Con Trenching, Inc. ("Tech Con") is a Texas corporation with its principal place of business located in Johnson City, Blanco County, Texas.  Tech Con has already made an appearance in this matter.

4.      Defendant David W. Conlon ("Conlon") is an individual resident of Blanco County, Texas.  Conlon has already made an appearance in this matter.

5.      Defendant Jeremy Gilbert d/b/a Gilbert Consulting and Design Firm ("Jeremy Gilbert" or "Gilbert") is an individual resident of Tarrant County, Texas.  Gilbert has already made an appearance in this matter.  Gilbert filed bankruptcy on September 1, 2020 while he was under an order of civil contempt by this Court and while sanctions motions were pending against him in this case. No claims for relief against Gilbert are asserted in this complaint. After Gilbert's bankruptcy filing, Plaintiffs sued Gilbert in an adversary proceeding in his bankruptcy case and filed a motion to have the reference withdrawn in the adversary proceeding on January 15, 2021.  Gilbert is named in this complaint only with respect to the pending order of civil contempt and the sanctions motions and to allege his involvement with respect to the remaining claims.

6.      Defendant Jack D. Smith ("Smith") is an individual resident of Denton County, Texas.  Smith has already made an appearance in this matter.

7.      Defendant CTS Manufacturing, LLC ("CTS") is a Texas limited liability company with its principal place of business located in Johnson City, Blanco County, Texas.  CTS may be served through its registered agent for service of process, Marc A. Jacobi & Associates, at 315 E. Highway Street, Fredericksburg, Texas 78624, or wherever it may be found.

8.      Defendant Green Machine & Tool, Inc. ("Green Machine") is a Texas corporation with its principal place of business located in South Houston, Harris County, Texas.  Green

Machine may be served through its registered agent for service of process, Shane Churchill, at 1007 Pennsylvania, South Houston, Texas 77587, or wherever he may be found.

## II.
## JURISDICTION AND VENUE

9.     Trench Tech asserts the following claims in this lawsuit: (1) violation of the Defend Trade Secrets Act (18 U.S.C. §§ 1836, *et seq.*); (2) violation of the Texas Uniform Trade Secrets Act (TUTSA) (Tex. Civ. Prac. & Rem. Code ch. 134A); (3) common law misappropriation of trade secrets; (4) conspiracy to misappropriate trade secrets for common law misappropriation of trade secrets; (5) breach of fiduciary duty; (6) conspiracy to breach fiduciary duty; and (7) tortious interference with existing contract.   This Court has subject matter jurisdiction over Trench Tech's claim for violation of the Defend Trade Secrets Act pursuant to 28 U.S.C. § 1331 because that claim arises under the laws of the United States.

10.     This Court has supplemental jurisdiction over Trench Tech's TUTSA, common law misappropriation of trade secrets, and conspiracy to misappropriate trade secrets claims for common law misappropriation of trade secrets pursuant to 28 U.S.C. § 1367 because these claims are so related to Trench Tech's claim for violation of the Defend Trade Secrets Act that they form part of the same case or controversy under Article III of the United States Constitution.   In this regard, Trench Tech's claims for TUTSA violations, common law misappropriation of trade secrets, and conspiracy to misappropriate trade secrets for common law misappropriation of trade secrets involve the same nucleus of operative facts as its Defend Trade Secrets Act claim.   Namely, all of the claims involve facts relating to a conspiracy by Tech Con, Conlon, Jeremy Gilbert, Smith, CTS, and Green Machine to misappropriate Trench Tech's trade secrets, and all four claims involve facts relating to the misappropriation of Trench Tech's trade secrets.

11.     This Court has supplemental jurisdiction over Trench Tech's breach of fiduciary duty and conspiracy to breach fiduciary duty claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Trench Tech's claim for violation of the Defend Trade Secrets Act that they form part of the same case or controversy under Article III of the United States Constitution.  In this regard, Trench Tech's breach of fiduciary duty and conspiracy to breach fiduciary duty claims involve the same nucleus of operative facts as its Defend Trade Secrets Act claim.  Namely, all three of those claims involve the fact that Trench Tech's former employees, Smith and Jeremy Gilbert conspired to and did in fact breach their fiduciary duties owed to Trench Tech by divulging Trench Tech's trade secrets to third parties.

12.     This Court has supplemental jurisdiction over Trench Tech International's tortious interference with an existing contract claim pursuant to 28 U.S.C. § 1367 because this claim is so related to Trench Tech's claim for violation of the Defend Trade Secrets Act that they form part of the same case or controversy under Article III of the United States Constitution.  In this regard, Trench Tech's tortious interference with an existing contract claim involves the same nucleus of operative facts as its Defend Trade Secrets Act claim.  Namely, both claims arise out of the protection of Trench Tech's trade secrets, and both claims involve facts relating to the unauthorized use of Trench Tech's trade secrets to manufacture parts for Trench Tech trenching machines.  The existing contract at issue in Trench Tech's tortious interference claim—an Agreed Permanent Injunction—was entered specifically to protect Trench Tech's trade secrets and to protect it and its wholly owned subsidiary, Southwest Industrial Sales, Inc., from unfair competition arising from misappropriation of Trench Tech's trade secrets.  Tech Con tortiously interfered with that Agreed Permanent Injunction by willfully and intentionally causing or inducing the parties to the Agreed Permanent Injunction to violate it by purchasing Trench Tech

parts from a supplier other than through Trench Tech and from SIS—a supplier that was using Trench Tech's misappropriated trade secrets to make the parts for Tech Con.

13.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because original defendant Jeremy Gilbert, who has filed bankruptcy, resides in the Northern District of Texas, and all defendants in this action are residents of Texas.

### III.
### FACTUAL BACKGROUND

**A.     Trench Tech's Business and Trade Secrets and Its Related Entities**

14.     Trench Tech International is an industry leader in the manufacturing of rugged, mechanically driven, chain-rock trenchers for cable, pipeline, water site development, and underground utility construction products.  Trench Tech International and its wholly owned subsidiary, Southwest Industrial Sales, Inc. ("SIS"), also service and provide parts for the trenchers that Trench Tech International manufactures.  Trench Tech International's trenchers and its and SIS's parts have been used in interstate commerce across the United States since approximately 1999.  More specifically, Trench Tech International, Trench-Tech, Ltd., and SIS have sold trenchers and/or parts in Texas, California, Arizona, New Mexico, Colorado, Utah, Nevada, Tennessee, Mississippi, Florida, Arkansas, Oklahoma, and Kansas. Trench Tech International does not sell trencher parts directly to domestic customers. Since approximately late 2012, SIS has handled the domestic parts sales business of Trench Tech International. Before then, the domestic parts sales business of Trench Tech International was handled by Trench-Tech, Ltd.

15.     Trench Tech's engineers and design teams have developed designs for certain trenching machinery, trenching parts, and other specialty equipment.  Trench Tech's design team possesses more than fifty (50) years of experience in trenching by having studied and used

trenching techniques and equipment across the world.  This experience has provided Trench Tech an advantage over its competitors and has led to Trench Tech's in-depth understanding and expertise of how to create machinery that literally digs, cuts and trenches through hard-ground materials productively and cost-efficiently.  Trench Tech designs and develops its trenching equipment to perform at high levels with low maintenance requirements.  This information and Trench Tech's designs and related information (the "Design Secrets") constitute protectable trade secrets under the Defend Trade Secrets Act, TUTSA, and Texas common law.  The Design Secrets can be used by a competitor to obtain an unfair competitive advantage in the trenching equipment and trenching parts business.

16.     Trench Tech provides its Design Secrets to its vendor manufacturers in order to manufacture the components of the trenching machinery and trenching parts.  However, prior to disclosing its Design Secrets to a vendor manufacturer, Trench Tech obtains from its vendor manufacturer and its agents an agreement not to disclose its Design Secrets and to keep them confidential.

17.     The production of trenching machinery and trenching parts is a highly competitive business in which success depends almost entirely on information, designs, and research about trenching techniques and equipment development across the world.  This competition and Trench Tech's experience have helped drive its in-depth understanding and expertise in how to design trenching machinery and trenching parts, including how to document and save information necessary to manufacture its trenching machinery and parts.  Additionally, success in the competitive trenching manufacturing and trenching parts industry also depends on research about customers such as: customer lists; the identities of customer contacts; the identities of and contact information for customer agents; pricing information; and information

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                              **Page 6**

concerning the costs and expenditures associated with operating a trenching machinery and trenching parts production business.  Success also depends on research about vendor manufacturers and service providers, including contacts for vendors, vendor pricing, vendor terms, and vender capabilities.  All these types of information, including its Design Secrets, constitute Trench Tech's confidential information ("Business Secrets").  If disclosed, Trench Tech's Business Secrets can be used by a competitor to obtain an unfair competitive advantage in the trenching machinery and trenching parts business.

18.     Through its efforts over the years, Trench Tech has developed its substantial body of Business Secrets described above, which is indispensable to its business.  This information is necessarily confidential in that it requires a substantial investment of time and resources to develop and is not readily obtainable or easily discoverable from other sources.  If disclosed to competitors, Trench Tech's Business Secrets present substantial advantages to Trench Tech competitors, allowing them to compete unfairly against Trench Tech by stealing what took years of work and investment for Trench Tech to develop and nurture.

19.     Trench Tech has taken reasonable measures to guard against disclosure of its Business Secrets, which could not be acquired in any way other than by extensive research efforts, the expenditure of large amounts of money, and years of experience.  In light of these facts, Trench Tech's Business Secrets constitute protectable trade secrets under Texas and federal law.

20.     Trench Tech International, Inc. is a closely held Texas corporation that Jerry Gilbert formed in 1996.  Its shareholders are Jerry Gilbert, his brother John Gilbert, and his son-in-law Kelly Ralls.  Initially, the business of Trench Tech International, Inc. was being a distributor for Trencor trenching machines.

21.     Trench Tech Management, L.C. is a limited liability company that Jerry Gilbert and others formed in 1997.  Jerry Gilbert is the sole member of Trench Tech Management, L.C., and he is and always has been its President and managing member.  The business of Trench Tech Management, L.C. is managing the business of Trench-Tech, Ltd. as its general partner.

22.     Trench-Tech, Ltd. is a limited partnership that Jerry Gilbert formed in 1997.  Its general partner is Trench Tech Management, L.C., and its limited partners are Jerry Gilbert, John Gilbert, and Kelly Ralls.  Beginning in 1999, when Trench Tech International, Inc. began to design, manufacture, and sell trenchers and trencher parts, the functions of Trench-Tech, Ltd. were owning the real estate that was the location of Trench Tech International, Inc.'s business and formally employing the persons who carried out Trench Tech International, Inc.'s business.  Trench-Tech, Ltd. also sold trencher parts domestically until Southwest Industrial Sales, Inc. took over domestic sales of trencher parts in approximately late 2012 to early 2013.

23.     Southwest Industrial Sales, Inc. ("SIS") is a Texas corporation that was formed in 2007. LaQuita Gilbert, Jerry Gilbert's wife, is the President of SIS, and the sole shareholder of SIS is Trench Tech International, Inc.  SIS is a wholly owned subsidiary of Trench Tech International, Inc.  SIS took over the domestic sales business of Trench-Tech, Ltd. in approximately late 2012 to early 2013.  In 2013, SIS took over Trench-Tech, Ltd.'s employer and payroll functions.

24.     Because of Trench Tech International, Inc.'s potential exposure to product-liability claims and suits as a Trencor trenching machine distributor, Trench-Tech, Ltd.'s initial functions included owning the real estate that was the location of Trench Tech International, Inc.'s business and employing the persons who carried out Trench Tech International, Inc.'s business.  While Trench-Tech, Ltd. formally employed and directly paid the engineering (design)

team, their wages were charged back to Trench Tech International, Inc., which reimbursed Trench-Tech, Ltd. for the engineering payroll.  When Trench Tech International, Inc. changed its business in 1999 to designing, manufacturing, and selling trenchers and trencher parts, Trench-Tech, Ltd. continued its function of formally employing and directly paying the engineering (design) team, and their wages were still charged back to Trench Tech International, Inc., which reimbursed Trench-Tech, Ltd. for the engineering payroll.  Also at that time, a decision and agreement were made by the three principals of Trench-Tech, Ltd., Trench Tech Management, L.C., and Trench Tech International, Inc.—Jerry Gilbert, John Gilbert, and Kelly Ralls—that all intellectual property relating to trenchers and trencher parts, including all intellectual property created by the engineering (design) team such as design drawings of trenchers and trencher parts, would be owned by Trench Tech International, Inc.

25.     This decision and agreement have been reflected in the title block of almost all of Trench Tech International, Inc.'s trade-secret design drawings since 1999, as illustrated by the following:

DRAWING PROPERTY OF:
TRENCH-TECH
INTERNATIONAL, INC.
P.O. BOX 99 – 330 BENSON LANE
ROANOKE, TX. 76262
© 1999 TRENCH-TECH

26.     This decision and agreement are also reflected in Trench Tech International, Inc.'s application for and registration of its "TRENCH-TECH™" trademark in 2000 with the United States Patent and Trademark Office.

27.     Trench Tech International, Inc. contends that it owns the Design Secrets and the Business Secrets, denies that Trench-Tech, Ltd. owns the Design Secrets and the Business

Secrets, and contends that it has standing to maintain the causes of action asserted in this complaint. Defendants contend that Trench Tech International, Inc. does not own the Design Secrets and the Business Secrets and therefore lacks standing, and they assert that Trench-Tech, Ltd. owns the Design Secrets and the Business Secrets.  In the event that the Court or a jury concludes that Trench Tech International, Inc. does not have standing because Trench-Tech, Ltd. owns the Design Secrets and the Business Secrets, Trench-Tech, Ltd. is being made a party plaintiff in this complaint.  Unless otherwise indicated, Trench Tech International, Inc. and Trench-Tech, Ltd. are collectively referred to herein as "Trench Tech" or "Plaintiffs."

**B.    Former Trench Tech Employees Jeremy Gilbert and Jack Smith Take Trench Tech's Trade Secrets and Use Them Without Trench Tech's Permission to Benefit Tech Con, Conlon, CTS, and Green Machine**

28.    As is evident, the Trench Tech entities are family owned and operated businesses. Jerry Gilbert and John Gilbert are brothers.  John Gilbert, Jeremy Gilbert's father, is the chief design engineer for Trench Tech.  Kelly Ralls, the third principal, is Jerry Gilbert's son-in-law. Jeremy Gilbert's father, uncle, and cousin-in-law are the officers, directors, and shareholders of Trench Tech International and the limited partners in Trench-Tech, Ltd.  LaQuita Gilbert, the wife of Jerry Gilbert and the President of SIS, is Jeremy Gilbert's aunt.

29.    Jeremy Gilbert began employment with Trench Tech on May 9, 2000.  As a result of Jeremy Gilbert's position of trust as a family member and employee, Jeremy Gilbert had access to Trench Tech's Business Secrets, including specifically design drawings.

30.    Jeremy Gilbert resigned from employment with Trench Tech on August 3, 2012. When Jeremy Gilbert resigned from Trench Tech, he had wrongfully acquired and retained Trench Tech's Business Secrets on his personal computer without Trench Tech's knowledge or consent.

31.     Following Jeremy Gilbert's resignation from Trench Tech, he began working for Tech Con.  Tech Con hired Jeremy Gilbert at Conlon's direction in order to obtain access to Trench Tech's Business Secrets, including specifically its design drawings, and Tech Con paid Jeremy Gilbert a salary approximately three times more than he had been making at Trench Tech.  Conlon and Tech Con knew that Jeremy Gilbert was employed by Trench Tech and knew of the relationship of trust that exists in family businesses such as Trench Tech.  Conlon and Tech Con knew that Jeremy Gilbert was not a design engineer and did not have the capability to design and engineer parts for the machines manufactured by Trench Tech.  Conlon and Tech Con also knew that Jeremy Gilbert did not own the confidential drawings, designs, and other Business Secrets of Trench Tech and had obtained such information through improper means.

32.     Jeremy Gilbert provided Trench Tech's Business Secrets to Tech Con and Conlon. Because Jeremy Gilbert had misappropriated Trench Tech's digital or "native" design drawings on his laptop, he was able to remove Trench Tech's name in the title block and replace it with "GILBERT CONSULTING AND DESIGN."  In furtherance of their design-drawing laundering scheme and to benefit Tech Con and Conlon, Jeremy Gilbert also changed the title block a second time, adding "TECH CON TRENCHING."  But not being a design engineer and being unskilled in the software, Jeremy Gilbert was not able to do much more than change the names in the title blocks.  The design drawings were too complex for him.  And most of them were too complex to be created by reverse engineering.

33.     After hiring Jeremy Gilbert in August 2012 and having him "launder" Trench Tech's design drawings, Tech Con and Conlon's next step in their scheme to misappropriate and use Trench Tech's Business Secrets was to form CTS on April 9, 2013 as the entity to order and buy replacement parts for Tech Con's trenching machines that had been manufactured by Trench

Tech and to order and buy parts and build their own Trench Tech trenching machines.  Having Trench Tech's Business Secrets and Design Secrets, and having laundered the Design Secrets so that either "GILBERT CONSULTING AND DESIGN" or "TECH CON TRENCHING" would be on the design drawings for Trench Tech's trenching machines and parts, Tech Con, Gilbert, and CTS could have any number of machine shops make the parts needed to replace broken or worn parts and to build Tech Con and CTS's own trenching machines—all at a much lower price than buying the trenching machines and parts from Trench Tech and SIS because they had not incurred the development costs for those design drawings.  Marc Jacobi, Tech Con's outside accountant and financial consultant who helped Tech Con and Conlon set up CTS, testified under oath in prior, unrelated litigation that CTS was set up to buy parts for repairs to Tech Con's Trench Tech trenchers and to buy parts and build Trench Tech trenchers for Tech Con. Jacobi explained that CTS was formed because Tech Con was having trouble getting parts manufacturers to make parts for Tech Con's Trench Tech trenchers and that they wanted to "get around" Trench Tech and buy parts directly from the parts manufacturers, not from Trench Tech. Conlon himself testified under oath in the same prior, unrelated litigation that he set up CTS so that, "[i]nstead of having to go through other people to order parts and then they put 30 percent markup on it," Tech Con could buy the parts from CTS.

      34.     Also, Jacobi testified that Tech Con and CTS built their first Trench Tech trencher, a Model 2500 and numbered TC 001 by Tech Con, starting it in 2014 and completing it in October 2015.  The mainframe for TC 001 was purchased through Trench Tech, which had it built by Longhorn Steel in Houston.  Trench Tech's John Gilbert personally delivered Trench Tech's design drawings for the Model 2500's mainframe to Longhorn Steel and obtained its standard nondisclosure agreement from Longhorn Steel.  Trench Tech and SIS sold many of the

parts for TC 001 to Jeremy Gilbert, who at that time had ended his employment with Tech Con and had started his own trencher parts business, having accomplished what Tech Con had hired him to do—steal Trench Tech's Business Secrets and Design Secrets, bring the Design Secrets to Tech Con, and launder them so that they had Gilbert's or Tech Con's name on them.  Longhorn Steel built the Trench Tech 2500 mainframe for Jeremy Gilbert and Gilbert Consulting that became Tech Con's TC 001.  Thereafter, and unknown to Trench Tech, Tech Con and CTS next built another knockoff Trench Tech Model 2500 trencher, numbered TC 002.  Jacobi gave conflicting testimony about when the work to build TC 002 began, stating both November 2015 and December 2016, and he testified that it was completed and put into service in June 2017. Green Machine, which had hired former key employees of Longhorn Steel (which closed when its owner died), including sales rep Robert La Chiusa, built the mainframe for the knockoff TC 002, and it was knowingly built by Green Machine using Trench Tech's misappropriated design drawings without Trench Tech's approval, permission, or consent.

35.     Jeremy Gilbert provided Trench Tech's Business Secrets to Tech Con, Conlon, CTS, and Green Machine. Jeremy Gilbert knew that he had a duty not to disclose Trench Tech's Business Secrets without Trench Tech's consent. In 2017, and unknown to Trench Tech, Jeremy Gilbert began ordering mainframes for Trench Tech Model 2000 trenchers from Green Machine, and they were sold to Tech Con along with a "product consulting fee" for providing the confidential drawings, designs, and trade secrets to Tech Con and CTS for each mainframe that Green Machine made.  Tech Con paid Jeremy Gilbert a consulting fee to have the Trench Tech drawings, designs, and trade secrets converted by Green Machine to a three-dimension (3D) design model to allow for the production of each of the four mainframes for the Trench Tech Model 2000 trencher.  Jeremy Gilbert provided the Trench Tech trade-secret drawings for the

2000 mainframe to Green Machine, which did the actual 3D drawing conversion and billed Gilbert Consulting $2,000.00.  Green Machine built at least four knockoff Trench Tech Model 2000 mainframes for Jeremy Gilbert, Tech Con, and CTS knowingly using Trench Tech's misappropriated design drawings.

36.     Trench Tech first learned that Jeremy Gilbert had misappropriated its trade secrets and had provided them to Tech Con and Conlon in April 2018.  Trench Tech first learned that Jeremy Gilbert had provided its misappropriated trade secrets to Green Machine and that Green Machine had used them in early 2019. Trench Tech first learned that Jeremy Gilbert had provided its misappropriated trade secrets to CTS in January 2020.

37.     Smith was employed by Trench Tech as a design engineer from January 6, 2003 through April 13, 2009.  As an employee of Trench Tech, Smith designed parts and generated technical drawings for Trench Tech parts.  In order to perform his job, Smith had access to almost all of Trench Tech's Business Secrets, including specifically its design drawings. Although Smith claims that he returned Trench Tech's designs when he ceased working for Trench Tech, Smith wrongfully retained Trench Tech's Business Secrets without Trench Tech's knowledge or consent.  Smith provided Trench Tech's Business Secrets to Tech Con and Conlon.  Smith has also attempted to conceal the use of Trench Tech's Business Secrets, but the designs and drawings provided by Smith to third parties were clearly derived from Trench Tech's Business Secrets, and not through reverse engineering.  Smith provided Trench Tech's Business Secrets to Tech Con and Conlon. Smith knew that he had a duty not to disclose Trench Tech's Business Secrets without Trench Tech's consent.

38.     Conlon and Tech Con knew that Smith did not prepare the designs and drawings without the use of Trench Tech's Business Secrets acquired by improper means.

39.     Trench Tech first learned that Smith had misappropriated its trade secrets and had provided them to Tech Con and Conlon in 2018.

**C.     While an Agreed Permanent Injunction Prevented the State Court Defendants (defined below) from Selling Trench Tech Parts, Tech Con Purchased Trench Tech Parts from one of the State Court Defendants with Full Knowledge of the Agreed Permanent Injunction**

40.     On or about April 1, 2011, Trench Tech International filed suit against Harold Randolph Lennard, Jr., Ronald Lynn Perdue, C.R.P. Machine & Welding, Inc. and Conex Equipment Manufacturing, LLC (collectively referred to as the "State Court Defendants") in the 348th District Court of Tarrant County, Texas in Cause No. 348-251999-11 (the "Lawsuit"). The Lawsuit involved Trench Tech International's claims that the State Court Defendants had misappropriated Trench Tech's Business Secrets, including its trade secrets.

41.     On or about August 16, 2012, Trench Tech International and the State Court Defendants entered into a Compromise and Settlement Agreement (the "Agreement") with regards to the Lawsuit.  The Agreement provided that the State Court Defendants would not market or sell a machine part that is unique and specific to Trench Tech trenching machines for a period of five (5) years.  The Agreement also provided for the entry of a Permanent Injunction prohibiting the State Court Defendants from directly or indirectly marketing, manufacturing, or selling parts that are unique to and specifically for machines manufactured by Trench Tech. In the time frame of late 2012 to early 2013, SIS, Trench Tech International's wholly owned subsidiary, took over Trench-Tech, Ltd.'s function as the domestic parts sales business of Trench Tech International.

42.     On or about January 23, 2013, an Agreed Permanent Injunction was signed by the State District Court prohibiting the State Court Defendants from directly or indirectly marketing, manufacturing, or selling parts that are unique to and specifically for machines that have been

manufactured by Trench Tech for a period of five (5) years.  A true and correct copy of the Agreed Permanent Injunction is attached hereto as Exhibit "A."  The Agreed Permanent Injunction also prohibited the State Court Defendants from directly or indirectly disclosing to any third party any of Trench Tech's confidential information, trade secrets, and/or proprietary information, including but not limited to Trench Tech's designs and specifications.  The Agreed Permanent Injunction was entered to keep the Design Secrets confidential and to prevent the State Court Defendants from using Trench Tech's trade secrets to manufacture and sell Trench Tech parts that customers would otherwise be ordering and purchasing from SIS.  Instead, those customers wanting to purchase parts unique to and specifically for machines manufactured by Trench Tech would have to purchase them through Trench Tech, the owner of the Design Secrets for those parts, and from SIS, its wholly owned subsidiary.

43.     Tech Con learned of the restrictions placed upon the State Court Defendants by the Agreed Permanent Injunction shortly after the Agreed Permanent Injunction was entered, specifically including the provisions that protected Trench Tech's Design Secrets and prohibited the State Court Defendants from directly or indirectly marketing, manufacturing, or selling parts that are unique to and specifically for machines that have been manufactured by Trench Tech. More specifically, Harold Randolph Lennard, Jr. (one of the State Court Defendants) told Conlon of Tech Con of the restrictions placed in the Agreed Permanent Injunction shortly after the Agreed Permanent Injunction was entered.  A true and correct copy of excerpts from Lennard's deposition reflecting that he told Tech Con about the restrictions in the Agreed Permanent Injunction are attached hereto as Exhibit "B."

44.     Despite knowing of the Agreed Permanent Injunction's restrictions, Tech Con willfully and intentionally interfered with the Agreed Permanent Injunction by purchasing from

Conex Equipment Manufacturing, LLC (one of the State Court Defendants) parts that were unique to and specifically for machines manufactured by Trench Tech and that were manufactured using Trench Tech's Design Secrets in violation and breach of the Agreed Permanent Injunction.  Before the Lawsuit, the State Court Defendants had misappropriated Trench Tech's confidential vendor pricing list and design drawings and had informed customers that they could sell parts unique to and specifically for Trench Tech machines at a price much lower (at cost plus ten per cent) than they would pay Trench Tech and SIS for the same part. The State Court Defendants could do this because they were using Trench Tech's misappropriated trade secrets and had not incurred the research, development, and labor costs to create those secrets.  These purchases were made after Tech Con learned of the restrictions but while the restrictions were still in place.  And these purchases were initiated by Tech Con because of their strong motive to buy the parts from Conex, who they knew would undersell Trench Tech and SIS, and who they knew needed the business because of the Agreed Permanent Injunction's restrictions and were therefore susceptible to being induced or persuaded to breach and violate the Agreed Permanent Injunction.  Tech Con actively participated in getting C.R.P. and Conex to violate the Agreed Permanent Injunction's restrictions.

45.     True and correct copies of select invoices reflecting purchases made by Tech Con in violation of the Agreed Permanent Injunction are attached hereto as Exhibit "C."  As can be seen in these invoices, Tech Con purchased from Conex parts that were unique to and specifically for machines manufactured by Trench Tech at various points from February 11, 2013 through July 29, 2017.  The invoices attached as Exhibit "C" include parts purchased for

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                        **Page 17**

various Trench Tech trenching machines, including but not limited to, models TT-2000, TT-2300, and TT-2500.[2]

46.     Trench Tech first learned that Tech Con had interfered with the Agreed Permanent Injunction by purchasing unique Trench Tech parts on or about April 30, 2018, when the attorney representing Trench Tech International in the State Court Lawsuit was provided the invoices attached as Exhibit "C" by the attorney representing the State Court Defendants.  Prior to that date, Trench Tech was unaware that Tech Con had purchased unique Trench Tech parts from the State Court Defendants in violation of the Agreed Permanent Injunction.

47.     Trench Tech International has suffered damages as a proximate result of Tech Con's tortious interference with the Agreed Permanent Injunction by their purchases of the unique Trench Tech parts from Conex.  In this regard (and as reflected in the invoices attached hereto as Exhibit "C"), Conex was paid monies by Tech Con relating to the unique Trench Tech parts.  If Tech Con had not interfered with the Agreed Permanent Injunction by purchasing the parts from Conex, those parts would have been purchased through Trench Tech and from SIS.  Tech Con has been unjustly enriched from its purchases of the unique Trench Tech parts through Conex, rather than through Trench Tech International and from SIS.

**IV.**
**CAUSES OF ACTION**

**A.     Violation of Defend Trade Secrets Act for Misappropriation after May 10, 2016
(Against Tech Con, Conlon, Smith, CTS, and Green Machine)**

48.     As described above, Trench Tech created and owned multiple trade secrets relating to the design, manufacture, use and sale of trenching machinery and trenching parts.

---

[2] Almost all of the invoices attached as Exhibit "C" reflect in the "For" line the type of Trench Tech machine that the purchased parts related to.  For example, some of the notations on the "For" line include: "TT2300," "TT2500," "2300," "2500," and "2000."

49.     Tech Con, Conlon, Gilbert, Smith, CTS, and Green Machine willfully and maliciously acquired, disclosed, or used Trench Tech's trade secrets through improper means.

50.     Trench Tech has been harmed as a result of Tech Con's, Conlon's, Gilbert's, Smith's, CTS's, and Green Machine's misappropriation of its trade secrets.  Trench Tech is entitled to recover damages consisting of the value of what Tech Con, Conlon, Smith, CTS, and Green Machine gained through their misappropriation.

51.     Trench Tech is entitled to entry of a permanent injunction, including but not limited to a permanent injunction: (a) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly using any of Trench Tech's trade secrets, confidential information, and proprietary information, including but not limited to Trench Tech's machine and part designs and specifications, build sheets, and vendor lists, in the manufacturing, marketing, selling, or use of parts that are designed or manufactured using any of Trench Tech's trade secrets, confidential information, and proprietary information; (b) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly using any machine and part designs and specifications and build sheets that were derived from Trench Tech's machine and part designs and specifications and build sheets in the manufacturing, marketing, selling, or use of parts; (c) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly disclosing to any third party any of Trench Tech's trade secrets, confidential information, and proprietary information, including but not limited to Trench Tech's machine and machine part designs and specifications, build sheets, and vendor lists; (d) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly manufacturing, marketing, or selling parts that are designed or manufactured using any of Trench Tech's trade secrets, confidential information, and proprietary information; (e) that prohibits Smith, Conlon,

Tech Con, CTS, and Green Machine from directly or indirectly approaching, soliciting, or contacting vendors for the purpose of manufacturing parts that are designed or manufactured using any of Trench Tech's trade secrets, confidential information, and proprietary information; (f) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly approaching, soliciting, or contacting a vendor for the purpose of buying parts for machines that have been manufactured by Trench Tech if the vendor's identity was obtained from Trench Tech's vendors list; and (g) that prohibits Conlon, Tech Con, CTS, and Green Machine from directly or indirectly using any of Trench Tech's trade secrets, confidential information, and proprietary information, including but not limited to Trench Tech's machine and part designs and specifications, build sheets, and vendor lists, in the manufacturing of any machine as a knockoff of a Trench Tech machine, all pursuant to 18 U.S.C. § 1836(b)(3)(A).

52.     Because Trench Tech's trade secrets were willfully and maliciously misappropriated, Trench Tech seeks an award of exemplary damages in an amount of not more than two times the amount of actual damages awarded against Tech Con, Conlon, Smith, CTS, and Green Machine pursuant to 18 U.S.C. § 1836(b)(3)(C).

53.     Because Trench Tech's trade secrets were willfully and maliciously misappropriated, Trench Tech also seeks its costs and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(d).

**B.      Violation of TUTSA (TEX. CIV. PRAC. & REM. CODE ch. 134A) for Misappropriation after August 31, 2013 (Against Tech Con, Conlon, Smith, CTS, and Green Machine)**

54.     As described above, Trench Tech created and owned multiple trade secrets relating to the design, manufacture, use and sale of trenching machinery and trenching parts.

55.     Tech Con, Conlon, Gilbert, Smith, CTS, and Green Machine willfully and maliciously acquired, disclosed, or used Trench Tech's trade secrets through improper means.

56.     Trench Tech has been harmed as a result of Tech Con's, Conlon's, Gilbert's, Smith's, CTS's, and Green Machine's misappropriation of its trade secrets.  Trench Tech is entitled to recover damages consisting of the value of what Tech Con, Conlon, Smith, CTS, and Green Machine gained—the amount of their unjust enrichment—through their misappropriation.

57.     Trench Tech is entitled to entry of a permanent injunction, including but not limited to a permanent injunction: (a) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly using any of Trench Tech's trade secrets, confidential information, and proprietary information, including but not limited to Trench Tech's machine and part designs and specifications, build sheets, and vendor lists, in any respect; (b) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly using any machine and part designs and specifications and build sheets that were derived from Trench Tech's machine and part designs and specifications and build sheets in the manufacturing, marketing, selling, or use of parts; (c) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly disclosing to any third party any of Trench Tech's trade secrets, confidential information, and proprietary information, including but not limited to Trench Tech's machine and machine part designs and specifications, build sheets, and vendor lists; (d) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly manufacturing, marketing, or selling parts that are designed or manufactured using any of Trench Tech's trade secrets, confidential information, and proprietary information; (e) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly ordering or purchasing parts that are designed or manufactured using any of Trench Tech's trade secrets, confidential information, and proprietary information from either Jeremy Gilbert, Tech Con, CTS, or Green Machine; (f) that prohibits Smith, Conlon, Tech Con, CTS, and Green

Machine from directly or indirectly approaching, soliciting, or contacting vendors for the purpose of manufacturing parts that are designed or manufactured using any of Trench Tech's trade secrets, confidential information, and proprietary information; (g) that prohibits Smith, Conlon, Tech Con, CTS, and Green Machine from directly or indirectly approaching, soliciting, or contacting a vendor for the purpose of buying parts for machines that have been manufactured by Trench Tech if the vendor's identity was obtained from Trench Tech's vendors list; (h) that orders Smith, Conlon, Tech Con, CTS, and Green Machine to return to Trench Tech any of Trench Tech's trade secrets, confidential information, and proprietary information, including but not limited to Trench Tech's machine and machine part designs and specifications, build sheets, and vendor lists; and (i) that orders Smith, Conlon, Tech Con, CTS, and Green Machine to destroy any machine and machine part designs and specifications and build sheets that were created by using Trench Tech's machine and machine part designs and specifications and build sheets and to destroy any vendor lists that contain vendors whose identities were acquired from Trench Tech vendors lists; and (j) that prohibits Conlon, Tech Con, CTS, and Green Machine from directly or indirectly using any of Trench Tech's trade secrets, confidential information, and proprietary information, including but not limited to Trench Tech's machine and part designs and specifications, build sheets, and vendor lists, in the manufacturing of any machine as a knockoff of a Trench Tech machine, all pursuant to Texas Civil Practice and Remedies Code § 134A.003.

58.     Because Trench Tech's trade secrets were willfully and maliciously misappropriated, Trench Tech seeks an award of exemplary damages in an amount of not more than two times the amount of actual damages awarded against Tech Con, Conlon, Smith, CTS, and Green Machine under Texas Civil Practice and Remedies Code § 134A.004(b).

59.     Because Trench Tech's trade secrets were willfully and maliciously misappropriated, Trench Tech also seeks its attorneys' fees under Texas Civil Practice and Remedies Code § 134A.005(3).

**C.     Common Law Misappropriation of Trade Secrets for Misappropriation Before September 1, 2013 (Against Tech Con, Conlon, Smith, and CTS)**

60.     As described above, Trench Tech created and owned multiple trade secrets relating to the design, manufacture, use, and sale of trenching machinery and trenching parts.

61.     Tech Con, Conlon, Gilbert, Smith, and CTS acquired, disclosed, or used Trench Tech's trade secrets through improper means, in violation of a confidential relationship with Trench Tech, or after acquiring the trade secrets with notice that their disclosure was improper.

62.     Trench Tech has been harmed as a result of Tech Con's, Conlon's, Gilbert's, Smith's, and CTS's misappropriation of its trade secrets.  Trench Tech is entitled to recover damages consisting of the value of what Tech Con, Conlon, Smith, and CTS gained—the amount of their unjust enrichment—through their misappropriation.

63.     Trench Tech is entitled to entry of a permanent injunction, including but not limited to a permanent injunction: (a) that prohibits Smith, Conlon, Tech Con, and CTS from directly or indirectly using any of Trench Tech's trade secrets, confidential information, and proprietary information, including but not limited to Trench Tech's machine and part designs and specifications, build sheets, and vendor lists, in the manufacturing, marketing, selling, or use of parts that are designed or manufactured using any of Trench Tech's trade secrets, confidential information, and proprietary information; (b) that prohibits Smith, Conlon, Tech Con, and CTS from directly or indirectly using any machine and part designs and specifications and build sheets that were derived from Trench Tech's machine and part designs and specifications and build sheets in the manufacturing, marketing, selling, or use of parts; (c) that prohibits Smith,

Conlon, Tech Con, and CTS from directly or indirectly disclosing to any third party any of Trench Tech's trade secrets, confidential information, and proprietary information, including but not limited to Trench Tech's machine and machine part designs and specifications, build sheets, and vendor lists; (d) that prohibits Smith, Conlon, Tech Con, and CTS from directly or indirectly manufacturing, marketing, or selling parts that are designed or manufactured using any of Trench Tech's trade secrets, confidential information, and proprietary information; (e) that prohibits Smith, Conlon, Tech Con, and CTS from directly or indirectly approaching, soliciting, or contacting vendors for the purpose of manufacturing parts that are designed or manufactured using any of Trench Tech's trade secrets, confidential information, and proprietary information; and (f) that prohibits Smith, Conlon, Tech Con, and CTS from directly or indirectly approaching, soliciting, or contacting a vendor for the purpose of buying parts for machines that have been manufactured by Trench Tech if the vendor's identity was obtained from Trench Tech's vendors list, all pursuant to Texas common law.

64.     Because Trench Tech's trade secrets were misappropriated with malice, Trench Tech seeks an award of exemplary damages against Tech Con, Conlon, Smith, and CTS under Texas Civil Practice and Remedies Code Chapter 41.

**D.     Conspiracy to Misappropriate Trade Secrets for Common Law Misappropriation Before September 1, 2013 (Against Tech Con, Conlon, Smith, and CTS)**

65.     Tech Con, Conlon, Gilbert, Smith, and CTS sought to misappropriate Trench Tech's trade secrets, and they reached a meeting of the minds regarding misappropriating Trench Tech's trade secrets.  Tech Con, Conlon, Gilbert, Smith, and CTS participated in one or more unlawful, overt acts taken in pursuit of the misappropriation of Trench Tech's trade secrets— namely: (1) Tech Con, and/or Conlon asked Gilbert and Smith to take Trench Tech's trade secrets without Trench Tech's authorization; (2) Gilbert and/or Smith took Trench Tech's trade

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                          **Page 24**

secrets without Trench Tech's authorization; and (3) Tech Con and CTS used Trench Tech's trade secrets without Trench Tech's authorization to further Tech Con and CTS's business. Trench Tech has suffered damages as a proximate result of Tech Con, Conlon, Gilbert, Smith, and CTS's conspiracy to misappropriate Trench Tech's trade secrets. Tech Con, Conlon, Smith, and CTS should be held jointly and severally liable for all acts done by any of them or by Gilbert in furtherance of their conspiracy to misappropriate Trench Tech's trade secrets.

**E.  Breach of Fiduciary Duty (Against Smith)**

66.   As a former employee of Trench Tech, Smith owed Trench Tech certain fiduciary duties relating to Trench Tech's Business Secrets.

67.   Smith breached his fiduciary duties owed to Trench Tech by divulging Trench Tech's Business Secrets to third parties, including Trench Tech's competitors.

68.   Trench Tech has been damaged as a result of Smith's breach of his fiduciary duties. Moreover, Smith has benefited by breaching his fiduciary duties owed to Trench Tech.

**F.  Conspiracy to Breach Fiduciary Duty (Against Tech Con, Conlon, and Smith)**

69.   Tech Con and Conlon sought to have Gilbert and Smith breach their fiduciary duties owed to Trench Tech, and they reached a meeting of the minds regarding this breach of fiduciary duties. As such, Tech Con, Conlon, Gilbert, and Smith participated in one or more unlawful, overt acts taken in pursuit of Gilbert and Smith's breaches of fiduciary duties, namely: (1) Tech Con and/or Conlon asked Gilbert and Smith to breach their fiduciary duties owed to Trench Tech by taking and/or disclosing Trench Tech's Business Secrets without Trench Tech's authorization; and (2) Gilbert and/or Smith breached their fiduciary duties owed to Trench Tech by taking and disclosing Trench Tech's Business Secrets without Trench Tech's authorization. Trench Tech has suffered damages as a proximate result of Tech Con, Conlon, Gilbert, and

Smith's conspiracy to have Gilbert and Smith breach their fiduciary duties owed to Trench Tech. Tech Con, Conlon, and Smith should be held jointly and severally liable for all acts done by any of them or by Gilbert in furtherance of their conspiracy to have Gilbert and Smith breach their fiduciary duties owed to Trench Tech.

### G.      Tortious Interference with Existing Contract (Against Tech Con)

70.     The Agreed Permanent Injunction prevented the State Court Defendants from marketing, manufacturing, or selling parts that are unique to and specifically for machines that have been manufactured by Trench Tech for a period of five (5) years.  The Agreed Permanent Injunction constitutes a valid contract entered into by Trench Tech.

71.     Despite learning of the Agreed Permanent Injunction shortly after the Agreed Permanent Injunction was entered, including learning of its protection of Trench Tech's Design Secrets and the requirement that the State Court Defendants not market, manufacture, or sell parts that are unique to and specifically for machines that have been manufactured by Trench Tech, Tech Con willfully and intentionally interfered with the Agreed Permanent Injunction by purchasing Trench Tech parts from Conex and made by C.R.P. (both State Court Defendants) after it had learned of the restrictions but before the restrictions had expired.

72.     Tech Con's tortious interference with the Agreed Permanent Injunction has proximately caused damages to Trench Tech.  Tech Con has been unjustly enriched from its purchases of the Trench Tech parts through Conex, rather than through Trench Tech and from SIS, based on the value of what Tech Con gained through its tortious interference with contract.

73.     Because Tech Con's tortious interference with the Agreed Permanent Injunction was done maliciously, Trench Tech is entitled to an award of exemplary damages.

**V.**
**THE DISCOVERY RULE**

74.     Trench Tech specifically pleads the application of the discovery rule with respect to its Defend Trade Secrets Act claim, TUTSA claim, common law misappropriation of trade secrets claim, conspiracy to misappropriate trade secrets claim for common law misappropriation, breach of fiduciary duty claim, and conspiracy to breach fiduciary duty claim. In this regard, Trench Tech did not discover that Smith and Gilbert had misappropriated its trade secrets and had provided them to Tech Con, CTS, and Conlon until April 5, 2018 and that Gilbert and/or Tech Con, Conlon, and CTS had provided them to Green Machine until early 2019.    Prior to those dates, Trench Tech was unaware that Smith and Gilbert had misappropriated its trade secrets and had provided them to Tech Con, Conlon, CTS, and Green Machine.

75.     Trench Tech specifically pleads the application of the discovery rule with respect to its tortious interference with existing contract claim.  In this regard, Trench Tech first learned that Tech Con had interfered with the Agreed Permanent Injunction by purchasing unique Trench Tech parts on or about April 30, 2018, when the attorney representing Trench Tech in the State Court Lawsuit was provided the invoices attached as Exhibit "C" by the attorney representing the State Court Defendants.  Prior to that date, Trench Tech was unaware that Tech Con had purchased unique Trench Tech parts in violation of the Agreed Permanent Injunction. Accordingly, limitations on Trench Tech's tortious interference claim should be deferred until April 30, 2018, the date when Trench Tech first learned of the tortious interference.

# VI.
## PRESERVATION OF EVIDENCE/SPOLIATION NOTICE TO ALL DEFENDANTS

76.     This is to notify you that you must retain and preserve all documents, tangible things (including machines and/or machine parts), and electronically stored information potentially relevant to the issues in this cause.  Electronically stored information should be afforded the broadest possible definition and includes, but is not limited to: (1) emails; (2) voicemails; (3) text messages; (4) word-processed documents; (5) spreadsheets; (6) accounting application data; (7) image and facsimile files; and (8) computer-aided design (CAD) files. **Failure to preserve these materials will result in a request for a spoliation instruction at any trial in this matter, and may ultimately be considered by a court as an attempt to destroy evidence.**

# VII.
## PRAYER

WHEREFORE, Trench Tech prays that this Court enter judgment for it and order the following relief against Defendants Tech Con Trenching, Inc., David W. Conlon, Jack Smith, CTS Manufacturing, LLC, and Green Machine & Tool, Inc.:

a)     actual damages;

b)     the value of what Tech Con, Conlon, Smith, CTS, and Green Machine gained through their misappropriation pursuant to 18 U.S.C. § 1836(b)(3)(B);

c)     actual damages under TUTSA (Texas Civil Practice and Remedies Code § 134A.004(a)), including the value of what Tech Con, Conlon, Smith, CTS, and Green Machine gained—the amount of their unjust enrichment—through their misappropriation;

d)     actual damages under Texas common law, including the value of what Tech Con, Conlon, Smith, and CTS gained—the amount of their unjust enrichment—through their misappropriation;

e)      unjust enrichment damages for the value of what Tech Con gained through their tortious interference with contract because of the purchases of Trench Tech parts through Conex, rather than through Trench Tech and from SIS;

f)      actual damages for Smith's breaches of his fiduciary duties to Trench Tech, including forfeiture of all income earned by him;

g)      permanent injunctions, as requested herein;

h)      exemplary damages in an amount not more than two times the amount of damages awarded to Trench Tech under 18 U.S.C. § 1836(b)(3)(C);

i)      exemplary damages in an amount not more than two times the amount of damages awarded to Trench Tech under Texas Civil Practice and Remedies Code § 134A.004(b);

j)      exemplary damages under Texas Civil Practice and Remedies Code Chapter 41;

k)      prejudgment interest as provided by law;

l)      postjudgment interest as provided by law;

m)      attorneys' fees;

n)      all costs incurred in prosecuting this action; and

o)      such other and further relief, general or special, whether at law or in equity, to which Trench Tech may be justly entitled.

Respectfully submitted,

CURNUTT & HAFER, L.L.P.

By:/s/ Stephen W. Kotara
    Kelly J. Curnutt
    State Bar No. 00787316
    KCurnutt@CurnuttHafer.com
    Stephen W. Kotara
    State Bar No. 11693200
    SKotara@CurnuttHafer.com

301 West Abram St.
Arlington, TX 76010
(817) 548-1000 - Telephone
(817) 548-1070 - Facsimile

*ATTORNEYS FOR PLAINTIFFS*

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                      **Page 29**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument was delivered by electronic service to the following parties and counsel of record on April 5, 2021:

Jonathan Pierce
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
*Attorney for Tech Con Trenching, Inc.*
*and David W. Conlon*

Michael Marconi
THE MARCONI FIRM
9284 Huntington Square, Suite 100
North Richland Hills, Texas 76182
*Attorney for Jack Smith*

*/s/ Stephen W. Kotara*
Stephen W. Kotara
