UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| TRENCH TECH INT'L, INC. & | § | |
| TRENCH-TECH, LTD., | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | Civil Action No. 4:19-cv-00201-O |
| | § | |
| TECH CON TRENCHING, INC., et al., | § | |
| | § | |
| **Defendants.** | § | |

<u>MEMORANDUM OPINION & ORDER</u>

Before the Court are Defendants' Motion for Summary Judgment (ECF Nos. 312–15, 426), filed February 18, 2022; Plaintiffs' Response (ECF Nos. 335–36, 342), filed March 14; Defendants' Reply (ECF Nos. 352–53), filed March 28; and Plaintiffs' Sur-Reply (ECF Nos. 378–79), filed April 19. Having considered the motion, briefing, and applicable law, the Court **DENIES** Defendants' motion for summary judgment.

## I.    BACKGROUND

Trench Tech International, Inc. sells large industrial machines called trenchers. As the name implies, trenchers are used to dig trenches for various construction products. Trench Tech International designs, manufactures, and sells trenchers and trencher parts internationally.[1] Jerry Gilbert formed Trench Tech International in 1996, and he, his brother John Gilbert, and his son-in-law Kelly Ralls hold the corporation's shares.[2] Jerry is the president, and John and Kelly are vice presidents.[3]

---

[1] Defs.' App. pt. 1, at 18–20, ECF No. 314.
[2] *Id.* at 13.
[3] *Id.* at 51.

Trench-Tech, Ltd. began as the domestic seller of trencher parts for Trench Tech International.[4] Trench-Tech, Ltd.'s limited partners are Jerry, John, and Kelly.[5] Trench-Tech, Ltd. also owned the real estate where Trench Tech International's business was located, and it employed the people who carried out Trench Tech International's business.[6] Eventually, Southwest Industrial Sales, Inc. took over the domestic sales business of Trench-Tech, Ltd.[7] Southwest is wholly owned by Trench Tech International.[8] Jerry's wife, LaQuita Gilbert, is the president of Southwest.[9]

John's son, Jeremy Gilbert, worked for Trench Tech[10] as a warehouse manager.[11] Jeremy left Trench Tech in August 2012 to work for Tech Con Trenching, Inc.[12] Tech Con performs trenching services and owns numerous Trench Tech trenchers.[13] Before leaving Trench Tech, Jeremy downloaded to his personal laptop Trench Tech's design drawings, which Trench Tech claims are trade secrets.[14] Trench Tech contends Jeremy also took other trade secrets, including related information about the parts and confidential business information.[15]

Trench Tech claims that Jeremy and another former Trench Tech employee, Jack Smith,[16] provided the trade secrets to David Conlon, Tech Con's CEO.[17] Conlon, through Tech Con and

---

[4] *Id.* at 27.
[5] Pls.' App. pt. 1, at 4, ECF No. 336. Trench-Tech, Ltd.'s general partner is Trench Tech Management, L.C. *Id.*
[6] *Id.* at 4, 13–14.
[7] *Id.* at 7.
[8] *Id.*
[9] *Id.*
[10] The Court uses "Trench Tech" to refer to the collective business of Trench Tech International and Trench-Tech, Ltd.
[11] Pls.' App. pt. 1, at 6, ECF No. 336.
[12] Pls.' App. pt. 2, at 106, ECF No. 336-1.
[13] Defs.' App. pt. 2, at 76, 81 ECF No. 314-1.
[14] Pls.' App. pt. 2, at 112–13, ECF No. 336-1.
[15] 4th Am. Compl. 7, ECF No. 249.
[16] Jack Smith worked at Trench Tech as a design engineer. Pls.' App. pt. 1, at 14, ECF No. 336.
[17] 4th Am. Compl. 11–12, ECF No. 249.

another company called CTS Manufacturing, LLC, then allegedly used the trade secrets to buy Trench Tech parts to repair and build Trench Tech trenchers.[18] Trench Tech claims that Tech Con built several Trench Tech machines with the trade secrets and the help of other vendors and machine shops.[19]

Trench Tech sued Tech Con, David Conlon, Jeremy Gilbert, Jack Smith, CTS Manufacturing, and Green Machine & Tool, Inc.[20] Trench Tech alleges (1) violation of the Texas Uniform Trade Secrets Act ("TUTSA"), (2) violation of the Defend Trade Secrets Act ("DTSA"), (3) common law misappropriation of trade secrets, (4) conspiracy to misappropriate trade secrets, (5) breach of fiduciary duty, (6) conspiracy to breach fiduciary duty, and (7) tortious interference with existing contract.[21] Trench Tech seeks damages and equitable relief.[22]

In 2019, Trench Tech served its first discovery request on Jeremy. Because Jeremy repeatedly failed to produce discovery and comply with Court orders, the Court held Jeremy in civil contempt and issued a bench warrant for his arrest.[23] After a contempt hearing, the Court released Jeremy from custody with orders to comply with discovery obligations.[24] A few months later, Jeremy filed for Chapter 7 bankruptcy, which automatically stayed proceedings in this case under 11 U.S.C. § 362.[25]

Trench Tech filed adversary proceedings against Jeremy in his bankruptcy. Trench Tech sought declarations that (1) this Court was not prohibited by the automatic stay from enforcing its

---

[18] *Id.*
[19] *Id.* at 12–14.
[20] *Id.* at 11–12. Trench Tech has since resolved its claims against Green Machine & Tool, which is no longer a party. *See* Order, ECF No. 345 (granting Trench Tech's motion to dismiss its claims against Green Machine).
[21] 4th Am. Compl. 23–31, ECF No. 249.
[22] *Id.*
[23] *See* Order, ECF No. 134.
[24] *See* Order, ECF No. 146.
[25] *See* Not. of Bankruptcy, ECF No. 172; Order, ECF No. 173.

sanctions and contempt orders against Jeremy, (2) the relief sought in Trench Tech's motions for sanctions are not "claims" that can be discharged in Jeremy's bankruptcy case, and (3) Trench Tech's claims for trade-secret misappropriation, breach of fiduciary duty, and conspiracy against Jeremy are non-dischargeable.[26] Trench Tech also reasserted its federal court claims and other claims against Jeremy.[27] The Court then withdrew the reference in the bankruptcy case, consolidating it with this case.[28]

Defendants Tech Con, David Conlon, CTS Manufacturing, and Jack Smith now move for summary judgment. Jeremy, the only other remaining Defendant, did not join the motion. Defendants move to dismiss all of Trench Tech's claims against them. They argue that (1) the statute of limitations bars Trench Tech's misappropriation claims, (2) Trench Tech's misappropriation claims and related conspiracy claims fail as a matter of law, (3) the statute of limitations bars Trench Tech's tortious interference claim, and (4) Trench Tech's breach-of-fiduciary-duty claims and related conspiracy claims fail as a matter of law and are barred by the statute of limitations.

## II. LEGAL STANDARD

Summary judgment is appropriate only where the pleadings and evidence show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). A genuine dispute of material fact exists "if the evidence is

---

[26] *See* Compl. 17–26, ECF No. 9-1, Case No. 4:21-cv-0059.
[27] *See id.*
[28] *See* Order, ECF No. 10, Case No. 4:21-cv-0059.

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he substantive law will identify which facts are material." *Id.* The movant must inform the court of the basis for its motion and identify the portions of the record that reveal there are no genuine disputes of material fact. *Celotex*, 477 U.S. at 323.

The court must view the evidence in the light most favorable to the nonmovant. *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013). "Moreover, a court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Id.* And if there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the court must deny the motion for summary judgment. *Anderson*, 477 U.S. at 250.

The opposing party must "identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the court must grant summary judgment. *Celotex*, 477 U.S. at 322. In that situation, no genuine dispute of material fact can exist, as the failure to establish an essential element of the claim "necessarily renders all other facts immaterial." *Id.* at 323.

## III.   ANALYSIS

### A.  Statute of Limitations on the Misappropriation of Trade Secrets

Trench Tech sues Defendants for trade secret misappropriation under the TUTSA, the DTSA, and Texas common law. All three claims are subject to a three-year statute of limitations. *See* 18 U.S.C. § 1836(d); Tex. Civ. Prac. & Rem. Code § 16.010(a); *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 721 (Tex. 2016). "A cause of action for trade-secret misappropriation accrues 'when the trade secret is actually used.'" *Sw. Energy Prod.*, 491 S.W.3d

at 721 (citation omitted). Actual use means "commercial use by which the offending party seeks to profit from the use of the secret." *Id.* at 722 (citation and internal quotation marks omitted). A continuing misappropriation does not restart the limitations period. *See* 18 U.S.C. § 1836(d); Tex. Civ. Prac. & Rem. Code § 16.010(b).

Federal and state law both recognize an exception to the limitations period called the discovery rule. *See* 18 U.S.C. § 1836(d); Tex. Civ. Prac. & Rem. Code § 16.010(a). Under the discovery rule, the statute of limitations does not begin to run until the plaintiff "knew or should have known of facts that in the exercise of reasonable diligence would have led to discovery of the misappropriation." *Sw. Energy Prod.*, 491 S.W.3d at 722. "Although the date a cause of action accrues is normally a question of law, reasonable diligence is an issue of fact." *Id.* (cleaned up).

Defendants argue that Trench Tech's misappropriation claims are barred by the three-year limitations period. According to Defendants, Trench Tech knew or should have known of any misappropriation long before Trench Tech claims it learned of the alleged misappropriation. Defendants point to six instances that they say started the clock on the causes of action for misappropriation: (1) August 2012, when Jeremy resigned from Trench Tech; (2) June 2013, when Trench Tech learned Jeremy was working in the trenching industry and procuring trencher parts for Tech Con; (3) December 2014, when Jeremy sent John emails containing information resembling Trench Tech's confidential business materials; (4) February 2014, when Trench Tech began purchasing parts from Jeremy that were potentially manufactured using the trade secrets; (5) November 2014, when Jeremy was purchasing parts from Southwest for resell to Tech Con to rebuild a trenching machine; and (6) June 2015, when Trench Tech confronted Jeremy about rumors that he was manufacturing trencher parts with the trade secrets.

The events identified by Defendants did not start the clock on Trench Tech's misappropriation claims as a matter of law. Rather, evidence may indicate that Trench Tech learned about the misappropriation of its trade secrets in March 2018, when it discovered that Tech Con had been buying Trench Tech parts from other manufacturers. At the very least, a reasonable jury could find that the earliest Trench Tech knew or should have known about the misappropriation was in March 2018, well within the limitations period.

### 1. Jeremy resigns from Trench Tech.

In August 2012, Jeremy resigned from Trench Tech. Defendants argue that Trench Tech should have known that Jeremy possessed trade secrets because Jeremy (1) had access to trade secrets during his employment and (2) did not return any trade secrets upon leaving Trench Tech.[29]

Trench Tech disputes that it knew that Jeremy took trade secrets when he resigned. While employed by Trench Tech (or shortly after resigning), Jeremy had access to Trench Tech's trade secrets, and he downloaded those trade secrets onto his personal laptop.[30] Jerry sent Jeremy an email informing Jeremy that he must return his keys and cell phone to receive his final paycheck, but Jerry did not request that Jeremy return trade secrets or other company property.[31] The record conflicts as to (1) whether anyone at Trench Tech searched some or all of Jeremy's laptop, and (2) whether John and Jerry knew about Jeremy's laptop. After resigning, Jeremy sent an email to LaQuita telling her, "Not a single time has my personal computer been used for anything work related and has never once accessed the Trench Tech or [Southwest] servers."[32]

Defendants have not shown that Jeremy's resignation should have alerted Trench Tech that he possessed trade secrets. First, Trench Tech disputes that Jeremy had authority to possess and

---

[29] Defs.' 2d Am. Summ. J. Br. 18–21, ECF No. 426.
[30] Pls.' App. pt. 1, at 6–8, ECF No. 336
[31] Defs.' App. pt. 1, at 89, ECF No. 314.
[32] *Id.* at 91.

download the trade secrets because Jeremy's job "did not require him to have or need a laptop computer with company information on it."[33] That Jeremy did not return any trade secrets is no surprise because he was not permitted to possess them in the first place. Second, the parties offer conflicting testimony as to the steps Trench Tech took to investigate Jeremy's laptop. One thing, however, is clear: Jeremy emphatically told his family that he never accessed Trench Tech's servers with his personal laptop. A jury could conclude from those facts that Trench Tech demonstrated reasonable diligence. Defendants have not shown as a matter of law that Trench Tech knew or should have known that Jeremy possessed trade secrets when he left Trench Tech.

### 2. Trench Tech learns that Jeremy was working in the trenching industry and procuring trencher parts for Tech Con.

In June 2013, Jeremy told John that he was reentering the trenching business. Jeremy wanted to buy parts from Trench Tech to resell to customers.[34] One of those customers would be Tech Con.[35] John welcomed that news, since Tech Con was not purchasing parts from Trench Tech at that time.[36] Jeremy and John agreed and began doing business together again. For several years, Jeremy purchased parts from Trench Tech (through Southwest) totaling over $1.4 million.[37]

Defendants argue that Jeremy's work in the trenching industry and with Tech Con should have alerted Trench Tech that he possessed the trade secrets. But, as John said, selling parts to Jeremy was an unsurprising and welcome development. Nothing about Jeremy's purchases would have indicated that Jeremy or Tech Con possessed Trench Tech's trade secrets. To the contrary, purchasing Trench Tech parts implies that Jeremy and Tech Con were not manufacturing those parts themselves. Defendants also say that Jeremy was assisting Tech Con with repair and

---

[33] Pls.' App. pt. 1, at 103, 108, ECF No. 336.
[34] *Id.* at 108.
[35] *Id.* at 108–09.
[36] *Id.*
[37] Defs.' App. pt. 2, at 38, ECF No. 314-1.

maintenance.[38] Again, Defendants fail to explain why that would have been a red flag for Trench Tech, which welcomed Tech Con's renewed business through Jeremy. Defendants have not shown as a matter of law that Trench Tech knew or should have known that Jeremy possessed trade secrets when he reentered the trenching industry and began doing business with Tech Con.

### 3. Jeremy sends emails containing information resembling Trench Tech's confidential business materials.

Defendants argue that sometime between October 2013 and March 2015, Trench Tech learned—or should have learned—that Jeremy possessed business information belonging to Trench Tech. Specifically, Defendants claim that Jeremy possessed and was actively using Trench Tech's parts books, outsourced parts lists, bills of material, and vendor information.[39] Defendants focus on an email Jeremy sent to John on December 9, 2014. The subject of the email was "2500 PARTS LIST," and Jeremy had attached spreadsheet titled "2500 PRICES.xlsx."[40] The spreadsheet contained a list of forty Trench Tech parts identified by part number, description, and quantity.[41] Defendants claim that the list is "remarkably similar" to Trench Tech's outsourced parts list, a trade secret.[42] Defendants argue the December 9 email—and others like it—should have alerted Trench Tech that Jeremy possessed much of Trench Tech's confidential business materials.

Trench Tech responds that the emails were not unusual. First, John says that he does not regularly use or reference Trench Tech's outsourced parts lists, so he would not have recognized a list that appeared similar.[43] Second, neither John nor his employees consult Trench Tech's outsourced parts list for pricing, so Jeremy's emails would not have prompted anyone at Trench

---

[38] Defs.' 2d Am. Summ. J. Br. 26, ECF No. 426.

[39] *Id.* at 28–29.

[40] Defs.' App. pt. 3, at 95–96, ECF No. 314-2.

[41] *Id.* at 96.

[42] Defs.' 2d Am. Summ. J. Br. 28, ECF No. 426 (citing Defs.' App. pt. 3, at 97–104, ECF No. 314-2).

[43] Pls.' App. pt. 1, at 110–11, ECF No. 336.

Tech to compare the lists.[44] Third, Trench Tech provides a parts book to every purchaser, so Tech Con and Jeremy likely possessed a parts book for the Model 2500 trencher.[45] The parts books are not trade secrets, and they contain most of the parts' names and numbers.[46] It was thus not a red flag to receive a spreadsheet that contained public information.

Defendants scoff at Trench Tech's explanations as "inconceivable" and "conclusory."[47] But the evidence shows there is nothing far-fetched about Trench Tech employees being unconcerned about a generic spreadsheet containing public information. The spreadsheet Jeremy sent is merely a list of forty parts—a small fraction of Trench Tech's outsourced parts list. Some of the parts in Jeremy's list have different names than those Trench Tech uses, and some names are standard in the industry.[48] And the spreadsheet is simple—any similarity in appearance between the lists is more readily explained by the logical organization of basic information. Defendants assert that Trench Tech should have deduced from Jeremy's email that he possessed Trench Tech's proprietary outsourced parts list, but that deduction is speculative. At the very least, a reasonable jury could reject Defendants' conclusion. Defendants have not shown that Trench Tech knew or should have known that Jeremy possessed trade secrets through his communications with Trench Tech employees as a matter of law.

### 4. Southwest begins purchasing parts from Jeremy that were manufactured using the trade secrets.

In February 2014, Southwest began purchasing headshaft sprockets from Jeremy.[49] Trench Tech had run out of sprockets and reached out to Jeremy to supply them.[50] Defendants suggest

---

[44] *Id.*
[45] *Id.* at 111.
[46] *Id.*
[47] Defs.' Resp. Br. 15–16, ECF No. 352.
[48] *See* Pls.' Reply Br. 21, ECF No. 378.
[49] Defs.' App. pt. 4, at 26–31, ECF No. 314-3.
[50] Pls.' App. pt. 1, at 113, ECF No. 336.

three explanations as to how Jeremy could have the sprockets manufactured: (1) Southwest provided Jeremy a manufacturing drawing for the sprockets, (2) Jeremy reverse-engineered the sprockets and created his own drawing, or (3) Jeremy possessed Trench Tech's manufacturing drawing, which was a trade secret.[51] Defendants say (1) Southwest did not provide Jeremy a drawing, and (2) Jeremy, who was not an engineer, was incapable of reverse-engineering the part. Thus, Defendants argue, Trench Tech should have inferred that Jeremy was manufacturing the headshaft sprockets using Trench Tech's drawings.

Trench Tech argues otherwise. John says that when Trench Tech ran out of the sprockets, he reached out to Jeremy because he knew Jeremy had an existing inventory of them.[52] According to John, Jeremy had the sprockets manufactured in China. The Chinese sprockets were inferior to Trench Tech's sprockets because they were made using sand casting rather than flame cutting. John says the inferior quality of the sprockets indicates that whoever made them had not used Trench Tech's drawings.[53] Finally, Trench Tech points out that it uses the headshaft sprocket on a variety of its trenchers.[54] The sprocket is thus not a trade secret, and other companies were permitted to manufacture the part.[55]

Trench Tech disputes a material fact. Defendants' argument relies on the inference that Jeremy possessed Trench Tech's trade secrets because Jeremy supplied Trench Tech with headshaft sprockets. But Defendants overlook arguably more reasonable inferences: that Jeremy had an existing inventory and used different drawings. At this stage, the Court must draw inferences in Trench Tech's favor. *See Ion*, 731 F.3d at 389. In any event, Trench Tech claims that

---

[51] Defs.' 2d Am. Summ. J. Br. 30, ECF No. 426.
[52] Pls.' App. pt. 1, at 113, ECF No. 336.
[53] *Id.* at 113–14. Defendants object to John's declaration, arguing that it is speculative, conclusory, and contradicted by other evidence. *See* Defs.' Resp. Br. 11, ECF No. 352. The court overrules these objections.
[54] Pls.' App. pt. 1, at 113, ECF No. 336.
[55] *Id.*; Defs.' App. pt. 4, at 69, 72, ECF No. 314-3.

the headshaft sprocket drawings are not proprietary. Defendants have not shown that Trench Tech knew or should have known that Jeremy possessed trade secrets when Southwest purchased the headshaft sprockets from Jeremy.

### 5. Trench Tech learns that Jeremy and Tech Con were building a trenching machine for Tech Con using Southwest parts.

In 2014, Tech Con began building a trencher called the TC001.[56] The TC001 was based on the Trench Tech Model 2500 Trencher, so Tech Con purchased many of the parts from Trench Tech.[57] Tech Con claims that it was transparent about why it was purchasing the parts and that Trench Tech knew that Tech Con was essentially building a Trench Tech trencher.[58] Indeed, John says that Jeremy told him Tech Con "wanted to buy all the trencher parts needed to be able to build its own Trench Tech Model 2500 trencher."[59] Tech Con owned the back end of a fire-damaged Model 2500, which Jeremy said they would use for a good portion of the parts.[60] Trench Tech sold Jeremy the mainframe, undercarriage, cab, hydraulics, sprockets, and wiring for the project.[61]

Defendants argue that Tech Con's TC001 should have put Trench Tech on notice that Defendants possessed Trench Tech's trade secrets. Defendants stress that Trench Tech knew that (1) Tech Con was building the TC001, (2) Tech Con was purchasing only some of the parts from Trench Tech, and (3) Tech Con was purchasing only some of the remaining parts from other vendors.[62] Defendants argue that Trench Tech could have compared the parts lists and inferred that Defendants were manufacturing some of their own parts.[63] And if Defendants were

---

[56] Defs.' App. pt. 4, at 76–77, ECF No. 314-3.
[57] Pls.' App. pt. 1, at 109, ECF No. 336.
[58] Defs.' 2d Am. Summ. J. Br. 31–32, ECF No. 426.
[59] Pls.' App. pt. 1, at 109, ECF No. 336.
[60] *Id.*
[61] *Id.*
[62] Defs.' 2d Am. Summ. J. Br. 31–32, ECF No. 426.
[63] *Id.* at 32–33.

manufacturing their own parts, Defendants argue, Trench Tech should have also inferred that Defendants possessed the trade secrets.[64]

Evidence in the record shows the following, raising a genuine dispute of material fact: At the time Jeremy was buying parts for the TC001, Jerry and John still did not know that Jeremy was employed by Tech Con.[65] And Jeremy's purchases, though unusual, were easily explained by Tech Con's plan to reconstruct a damaged Model 2500 trencher by sourcing parts from a variety of places.[66] To be sure, Jerry admits that he knew that Tech Con was sourcing some parts such as the digging boom from other suppliers.[67] Jerry also says that by comparing the parts lists he could have easily determined which parts Tech Con bought elsewhere.[68] But Defendants provide insufficient evidence as to *why* Jerry should have taken such steps. Jeremy's representations to Trench Tech provided a legitimate justification for Tech Con's purchases and explain why Trench Tech did not investigate. No one at Trench Tech had reason to suspect that Tech Con was manufacturing its own parts, let alone that it was using Trench Tech's trade secrets to do so. At bottom, Defendants' argument relies on a chain of inferences that it says Trench Tech should have drawn. The evidence demonstrates a material dispute as to whether Trench Tech possessed information sufficient to draw those inferences, and whether those inferences are reasonable. Defendants have not shown that Trench Tech knew or should have known that Jeremy possessed trade secrets when Jeremy purchased parts for Tech Con to build the TC001 trencher.

---

[64] *Id.*
[65] Pls.' App. pt. 1, at 13–14, 104, ECF No. 336.
[66] Pls.' Am. Resp. Br. 37–38, ECF No. 342
[67] Defs.' App. pt. 4, at 77–78, ECF No. 314-3.
[68] *Id.*

### 6.   Trench Tech confronts Jeremy about rumors that he was manufacturing trencher parts with the trade secrets.

In 2015, Jerry began hearing rumors that Jeremy was "cheating."[69] Vendors told Jerry that Jeremy had Trench Tech's drawings and was using them to make Trench Tech parts.[70] The vendors did not have documents or information about the drawings, but they inferred after seeing the parts that Jeremy was using Trench Tech drawings.[71] According to Jerry, "[Trench Tech] parts are pretty unique," and "it's pretty easy to tell" whether a given part was made by Trench Tech.[72]

In June of 2015, Jerry confronted Jeremy about the rumors.[73] Jeremy repeatedly denied that he possessed Trench Tech drawings and that he had been using Trench Tech drawings to make parts.[74] Jerry warned him, "[I]f I find out you're doing it, I will do everything I can to prosecute you."[75] Jerry did not ask to check Jeremy's computer, but John checked Trench Tech's database to find out if someone had accessed any drawings, with inconclusive results.[76]

Defendants fault Trench Tech for failing to investigate further. They say that Trench Tech should have asked to examine Jeremy's computer, hired a forensics consultant, or requested more information from the vendors.[77] Trench Tech responds that it demonstrated reasonable diligence in asking Jeremy and investigating the rumors.[78] Trench Tech points to Jeremy's firm denials during the confrontation and the fact that Jeremy was legitimately buying parts from Trench Tech.[79] The question is whether Jerry acted reasonably in trusting the word of Jeremy, his nephew,

---

[69] Defs.' App. pt. 1, at 29, ECF No. 314.
[70] *Id.* at 29–31.
[71] *Id.* at 30–31.
[72] *Id.* at 31.
[73] *Id.* at 29.
[74] *Id.* at 29, 31.
[75] Defs.' App. pt. 1, at 29, ECF No. 314.
[76] *Id.* at 32.
[77] Defs.' 2d Am. Summ. J. Br. 35, ECF No. 426.
[78] Pls.' Am. Resp. Br. 28–29, ECF No. 342.
[79] *Id.* at 28–29.

when evidence corroborated Jeremy's innocent explanation. The answer largely depends on the witnesses' credibility and whether Trench Tech's cursory investigation was reasonably diligent. It is, in other words, a question for the jury.

Defendants also complain that Jerry's declaration contradicts his deposition testimony, and requests that the Court strike the declaration.[80] The declaration largely corrects or clarifies the identity of those who told Jerry about the rumors.[81] To the extent the declaration contradicts Jerry's deposition testimony, those contradictions are immaterial. Jerry's deposition testimony maintains that (1) he heard rumors from vendors about Jeremy's activity, (2) he investigated the rumors by confronting Jeremy, (3) John investigated Trench Tech's databases, and (4) Jeremy repeatedly denied the rumors. Jerry's declaration does not contradict those facts, which are sufficient to create a material dispute as to whether Trench Tech exercised reasonable diligence. Thus, Defendants have not shown that Trench Tech knew or should have known that Jeremy possessed trade secrets when Trench Tech confronted Jeremy about the rumors.

\* \* \*

Defendants are not entitled to summary judgment on the discovery rule for Trench Tech's misappropriation claims. Defendants have not produced evidence establishing as a matter of law that Trench Tech "knew or should have known of facts that in the exercise of reasonable diligence would have led to discovery of the misappropriation" outside the limitations period. *Sw. Energy Prod.*, 491 S.W.3d at 722. Defendants primarily rely on two cases that they say are analogous.

First, Defendants cite *Seatrax, Inc. v. Sonbeck International, Inc.*, 200 F.3d 358 (5th Cir. 2000). In *Seatrax*, the Fifth Circuit affirmed summary judgment dismissing trade secret misappropriation claims as barred by the statute of limitations. *Id.* at 367. The plaintiff, Seatrax,

---

[80] Defs.' Reply Br. 8–9, ECF No. 352.
[81] *Id.* at 8–9.

manufactured offshore marine cranes. *Id.* at 362–63. Seatrax sued one of its customers, Branham Industries, for violating a licensing agreement and refusing to return Seatrax's technology. *Id.* Seatrax later learned that three former employees of Branham started their own company as an aftermarket supplier of marine crane parts using Seatrax's trade secrets. *Id.* Seatrax sued the three individuals and the company they had formed. *Id.* The record revealed several events over a three-year period that the panel said should have alerted Seatrax of possible misappropriation: (1) the individual defendants formed their company during Seatrax's litigation with Branham, (2) the defendants had access to Seatrax's trade secrets when they worked for Branham, (3) Seatrax's trade secrets were missing from Branham's premises after the litigation, (4) Seatrax purchased replacement parts from the defendants that were similar to Seatrax's proprietary parts, and (5) Seatrax's customers raised questions about the defendant company's status as a distributer of Seatrax's parts. *Id.* at 365–66.

Defendants claim this case is "remarkably similar" to *Seatrax*,[82] but they overlook important differences. First, the panel in *Seatrax* implied that Seatrax should have known that someone had removed the trade secrets when a Seatrax officer had searched Branham's premises for trade secrets and found them missing. *Id.* at 365. Jeremy, in contrast, copied computer files—he did not physically remove anything from Trench Tech property, which may have alerted Trench Tech that something was amiss. Second, Seatrax purchased replacement parts from the defendants resembling those that Seatrax manufactured. *Id.* at 365–66. Defendants say the same is true here, but Trench Tech disputes the similarity of the parts. The record conflicts as to whether the headshaft sprockets Jeremy sold to Trench Tech were manufactured using Trench Tech's trade secrets.[83] Third, although both Seatrax and Trench Tech heard rumors of misappropriation, Trench

---

[82] Defs.' 2d Am. Summ. J. Br. 41, ECF No. 426.

[83] *See supra* Section III.A.4.

Tech confronted Jeremy about the rumors, and Jeremy denied them. This case is different in many other respects from *Seatrax*, including the family relationship of the parties and Jeremy's obfuscations before and during litigation. This case, in short, is not like *Seatrax*.

Next, Defendants cite *Clean Energy v. Trillium Transportation Fuels, LLC*, No. CV 19-244, 2021 WL 3410668 (S.D. Tex. July 6, 2021), *report and recomm. adopted*, 2021 WL 3406656 (S.D. Tex. Aug. 3, 2021). In *Clean Energy*, the district court adopted the magistrate judge's opinion granting summary judgment dismissing trade secret misappropriation claims as barred by the statute of limitations. *Id.* at *10. The magistrate judge found significant that the plaintiff knew that (1) the defendant, a former employee, had access to the plaintiff's trade secrets, (2) the defendant refused to acknowledge an obligation to protect the trade secrets, (3) the defendant misrepresented his intentions upon leaving plaintiff's employment, (4) the defendant worked for a competitor, (5) the defendant solicited business from entities that he knew were plaintiff's producers and customers, and (6) the plaintiff's executives discussed the defendant's wronging and sent him a cease-and-desist letter. *Id.* at *9.

Again, this case is different. First, unlike the defendant in *Clean Energy*, Jeremy did not refuse to acknowledge his obligation to protect the trade secrets. Indeed, Jeremy acknowledged the confidential nature of the trade secrets,[84] and he repeatedly denied that he possessed any trade secrets.[85] Second, although Jeremy did misrepresent his employment, John and Jerry did not discover that fact until March 2018, when Trench Tech says the limitations period began.[86] Third, unlike the plaintiff in *Clean Energy*, Trench Tech did not send Jeremy a cease-and-desist letter or otherwise indicate it knew of his misappropriations outside the limitations period. Fourth, unlike

---

[84] Pls.' App. pt. 2, at 78–80, ECF No. 336-1.

[85] Defs.' App. pt. 1, at 29, 31, ECF No. 314.

[86] Pls.' App. pt. 1, at 14, 104–05, ECF No. 336.

the defendant in *Clean Energy*, Jeremy continued business with Trench Tech, primarily by purchasing parts from them. *Clean Energy* does not support summary judgment in this case.

The evidence indicates that Trench Tech learned of Defendants' misappropriations in March 2018 when conducting discovery in a related case. Back in 2011, Trench Tech had sued Conex Equipment Manufacturing and several individuals for trade secret misappropriation.[87] The parties settled the dispute and executed an agreement that, among other things, prohibited the Conex defendants from manufacturing and selling most Trench Tech parts.[88] In the fall of 2017, Trench Tech learned that the Conex defendants were likely violating the injunction, so Trench Tech moved to hold the Conex defendants in contempt.[89]

During discovery for the contempt proceedings in March 2018, Trench Tech learned that Tech Con been purchasing Trench Tech parts from Conex.[90] Trench Tech also learned that Jeremy and David Conlon possessed proprietary design drawings of a Trench Tech mainframe and undercarriage.[91] A few days later, John, Jerry, and Trench Tech's counsel met with Jeremy to discuss what they had learned. In that meeting, Jeremy admitted that he took Trench Tech design drawings on his personal laptop, that Tech Con hired him when he resigned from Trench Tech, that he shared Trench Tech design drawings with Tech Con, and that he and Tech Con were building trenchers and trencher mainframes from the Trench Tech design drawings.[92] One year later, Trench Tech filed this lawsuit.

Defendants do not present evidence that Trench Tech knew of any misappropriation prior to March 2018. They present some evidence that Trench Tech could have discovered the

---

[87] *Id.* at 12, 30.
[88] *Id.* at 12, 30–54.
[89] *Id.* at 13, 70–78.
[90] *Id.* at 13; Pls.' App. pt. 2, at 11–14, ECF No. 336-1.
[91] Pls.' App. pt. 2, at 12–13, ECF No. 336-1.
[92] Pls.' App. pt. 1, at 14, ECF No. 336; Pls.' App. pt. 2, at 13–14, ECF No. 336-1.

misappropriation earlier. But the parties dispute whether Trench Tech's efforts demonstrate reasonable diligence, which is an issue of fact. *See Sw. Energy Prod.*, 491 S.W.3d at 722. Although some courts have granted summary judgment in favor of defendants on the issue of reasonable diligence, the record in this case does not support such a ruling. Defendants' chains of inferences do not trigger the limitations period as a matter of law. *Id.* at 724. Defendants fault Trench Tech for viewing the events in isolation, but these signals over time, even when viewed collectively, do not indicate that Trench Tech should have known of the misappropriation earlier as a matter of law.[93] Having reviewed the record and briefing,[94] the Court concludes that Defendants have not carried their burden to show that as a matter of law Trench Tech knew or should have known of Defendants' misappropriation of trade secrets outside the limitations period.

## B.  Misappropriation of Trade Secrets

Defendants next argue that Trench Tech's misappropriation claims and the related conspiracy claims fail as a matter of law. Trench Tech alleges misappropriation under the TUTSA, the DTSA, and Texas common law. Defendants have not shown that Trench Tech will be unable to establish the misappropriation elements at trial.

### 1.  Defendants are not entitled to summary judgment on Trench Tech's misappropriation claim under the Texas Uniform Trade Secrets Act.

The TUTSA allows the owner of a trade secret to recover damages suffered from misappropriation of the trade secret. *See* Tex. Civ. Prac. & Rem. Code § 134A.002. The elements of trade secret misappropriation under the statute are "(1) ownership of a trade secret; (2)

---

[93] Defs.' Resp. Br. 18–19, ECF No. 352.

[94] This Opinion discusses the larger events that Defendants say should have put Trench Tech on notice of the misappropriation. Defendants point to numerous other bits of information that they say should have also alerted Trench Tech. Those other bits of evidence are either disputed, immaterial, innocuous, or too inconsequential to start the clock on the statute of limitations. Although this Opinion does not exhaustively discuss every bit of information Defendants raise, the Court's conclusion rests on its complete review of the record and briefing.

misappropriation of the trade secret; and (3) an injury, if the plaintiff is seeking damages." *Retail Servs. WIS Corp. v. Crossmark, Inc.*, No. 05-20-00937-cv, 2021 WL 1747033, at *8 (Tex. App. May 4, 2021) (citing Tex. Civ. Prac. & Rem. Code § 134A.002).

Defendants claim that Trench Tech cannot satisfy the second element, misappropriation. Under the statute, misappropriation includes various activities that, in general, require the plaintiff to show that "the trade secret was acquired through a breach of a confidential relationship or discovered by improper means," and that "the trade secret was used without authorization." *Snowhite Textile & Furnishings, Inc. v. Innvision Hosp., Inc.*, No. 05-18-01447-cv, 2020 WL 7332677, at *4 (Tex. App. Dec. 14, 2020) (citing Tex. Civ. Prac. & Rem. Code § 134A.002). Improper means include "theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy." Tex. Civ. Prac. & Rem. Code § 134A.002(2). Trench Tech claims Defendants misappropriated the trade secrets in three ways: (1) Jeremy was not authorized to access and possess Plaintiffs' native design drawings, (2) Jack Smith and Jeremy both admitted they knew the trade secrets were confidential, and (3) Smith and Jeremy owed a fiduciary duty to Trench Tech.[95]

First, Defendants argue that they did not acquire the trade secrets through improper means. According to Defendants, Trench Tech "freely disclosed" the trade secrets to Jeremy.[96] Trench Tech admits that Jeremy was authorized to *access* the trade secrets but disputes that Jeremy was authorized to "acquire" the trade secrets. "Jeremy was entrusted with access to design drawings of parts, parts lists, and vendor information on Trench Tech computers and servers."[97] Jeremy's job, however, "did not require him to have or need a laptop computer with company information on

---

[95] Pls.' Am. Resp. Br. 46–50, ECF No. 342.
[96] Defs.' 2d Am. Summ. J. Br. 48, ECF No. 426 (*Educ. Mgmt. Servs., LLC v. Tracey*, 102 F. Supp. 3d 906, 914 (W.D. Tex. 2015)).
[97] Pls.' App. pt. 1, at 6, ECF No. 336.

it," because "[p]arts transactions could only be done on the company desktop computers."[98] Jeremy was not authorized to download the native design drawings on his laptop or otherwise acquire them.[99] Defendants cite no authority supporting their theory that an employee's limited access to trade secrets forecloses a jury finding that the employee "acquired" the trade secrets "by improper means." Tex. Civ. Prac. & Rem. Code § 134A.002(2); *cf. Snowhite Textile & Furnishings*, 2020 WL 7332677, at *7 (holding that providing employees limited, protected access to confidential information constituted protection of trade secrets). Trench Tech has provided sufficient evidence for a jury to find that Jeremy—and the other Defendants—acquired the trade secrets through theft, misrepresentation, or other improper means. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(2).

Second, Defendants argue that Jeremy did not breach a confidential relationship with Trench Tech. Defendants' argument distinguishes between the two Trench Tech entities. Trench Tech International owns the trade secrets,[100] and Trench-Tech, Ltd. employs the workers.[101] Defendants argue that Jeremy owed a duty of confidence only to his employer, Trench-Tech, Ltd, and thus did not breach a confidential relationship with the owner of the trade secrets, Trench Tech International.[102] But Texas law does not support Defendants' narrow view of confidential relationships. "As used in a claim for misappropriation of trade secrets . . . 'confidential relationship' means a relationship in which the owner of a trade secret discloses it 'in confidence so as to place the other party under a duty to keep his secret.'" *Kana Energy Servs., Inc. v. Jiangsu Jinshi Mach. Grp.*, 565 S.W.3d 347, 352 (Tex. App. 2018) (citation omitted). Trench Tech has presented ample evidence—mostly Jeremy's own deposition testimony—that Jeremy knew of his

---

[98] *Id.* at 103.
[99] *Id.* at 108.
[100] *Id.* at 5–6.
[101] Defs.' App. pt. 1, at 4, 13–14, ECF No. 314.
[102] Defs.' 2d Am. Summ. J. Br. 49–50, ECF No. 426.

duty to keep the trade secrets confidential.[103] Defendants cite *Kana Energy Services* for the proposition that an employees' confidential relationship extends only to his "actual employer."[104] Defendants misread the case. The court provided, as an "example," that "[e]mployers and employees have a confidential relationship in which the employee is given access to trade secrets only in furtherance of the employer's business." *Kana Energy Servs.*, 565 S.W.3d at 352. But that *example* does not override the general rule, and Defendants cite no controlling authority supporting their narrow view of confidential relationships. Trench Tech has presented sufficient evidence for a jury to find that Jeremy was aware of his "duty to keep his secret," and thus the Defendants acquired the trade secrets through breach of a confidential relationship. *Kana Energy Servs.*, 565 S.W.3d at 352. Defendants have failed to show that summary judgment is warranted on Trench Tech's TUTSA claim.

### 2. Defendants are not entitled to summary judgment on Trench Tech's misappropriation claim under the Defend Trade Secrets Act.

The DTSA permits "[a]n owner of a trade secret that is misappropriated [to] bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The elements of a misappropriation claim under the statute are "(1) ownership of a trade secret that (2) has been misappropriated and that (3) relates to a product or service in interstate commerce." *Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585, 594 (E.D. Tex. 2021). "A person misappropriates a trade secret when the person uses improper means to acquire knowledge of a trade secret and then discloses or uses a trade secret without consent." *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 698 (E.D. Tex. 2020) (citing 18 U.S.C. § 1839(5)(B)(i)). Improper means include

---

[103] *E.g.*, Pls.' App. pt. 2, at 63–64, 66, 78–79, 83, 97, ECF No. 336-1.
[104] Defs.' 2d Am. Summ. J. Br. 49–50, ECF No. 426.

"theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A). Defendants argue that Trench Tech cannot prove is claim under the DTSA "[f]or the same reasons" that it cannot do so under the TUTSA.[105] The Court thus rejects Defendants' DTSA arguments for the same reasons the Court rejected their TUTSA arguments. Defendants have failed to show that summary judgment is warranted on Trench Tech's DTSA claim.

### 3. Defendants are not entitled to summary judgment on Trench Tech's misappropriation claim under Texas common law.

Prior to enactment of the TUTSA, misappropriation of trade secrets was a cause of action under Texas common law.[106] Trench Tech asserts common law misappropriation for Defendants' actions occurring before the TUTSA's effective date of September 1, 2013.[107] "Trade secret misappropriation under Texas law is established by showing: (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff." *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 600 (5th Cir. 2015) (citation and internal quotation marks omitted). Again, Defendants merely reincorporate their TUTSA arguments against Trench Tech's common law claims.[108] The Court thus rejects those arguments for a third time. Defendants have

---

[105] *Id.* at 51–52.

[106] The TUTSA "displaces conflicting tort, restitutionary, and other law of [Texas] providing civil remedies for misappropriation of a trade secret." Tex. Civ. Prac. & Rem. Code § 134A.007(a). The TUTSA "'applies to the misappropriation of a trade secret made on or after' the Act's effective date of September 1, 2013." *Kana Energy Servs., Inc. v. Jiangsu Jinshi Mach. Grp.*, 565 S.W.3d 347, 352 n.3 (Tex. App. 2018) (quoting 2013 Tex. Gen. Laws 12, 14). Given that the parties dispute the timeline of events, they also dispute which substantive law applies. *See* Pls.' Trial Br. on DTSA's Application, ECF No. 429; Defs.' Trial Br. on the Inapplicability of the DTSA, ECF No. 430. The parties do not raise those arguments in the summary judgment briefing, however, so the Court does not address them in this Opinion. Defendants' argument on summary judgment is only that Trench Tech cannot meet the elements of common law misappropriation.

[107] 4th Am. Compl. 27–28, ECF No. 249.

[108] Defs.' 2d Am. Summ. J. Br. 52–53, ECF No. 426.

failed to show that summary judgment is warranted on Trench Tech's common law misappropriation claim.

### 4. Defendants are not entitled to summary judgment on Trench Tech's related conspiracy claims.

Defendants also move for summary judgment on Trench Tech's claims for conspiracy to misappropriate. A conspiracy claim is derivative of the underlying tort. *Agar Corp. v. Electro Cirs. Int'l*, 580 S.W.3d 136, 138 (Tex. 2019). Defendants argue that "[i]f the court dismisses Plaintiffs' claims for misappropriation, then the court must dismiss Plaintiffs' conspiracy to misappropriate trade secrets claims, too."[109] Likewise, because the Court has denied Defendants' summary judgment motion on the underlying torts, the Court also denies Defendants' summary judgment motion on the conspiracy claims.

### C.  Statute of Limitations on Tortious Interference

Defendants next argue that the statute of limitations bars Trench Tech's claim for tortious interference. Trench Tech alleges that Tech Con tortiously interfered with the agreed permanent injunction between Trench Tech and the Conex defendants by purchasing unique Trench Tech parts from Conex.[110] Tortious interference claims are generally subject to a two-year statute of limitations. *Nath v. Texas Children's Hosp.*, 446 S.W.3d 355, 370 (Tex. 2014). Trench Tech says that it learned of Tech Con's interference through documents discovered in the contempt proceedings in April 2018.[111]

Defendants argue that Trench Tech should have known about Tech Con's involvement years earlier. Defendants point to a series of conversation between Jeremy and Trench Tech in 2014 and 2015. Defendants say that Trench Tech should have known from those conversations

---

[109] *Id.* at 53.
[110] 4th Am. Compl. 21–22, ECF No. 249.
[111] Pls.' App. pt. 1, at 13–14, 104–05, ECF No. 336.

that (1) Jeremy was procuring trencher parts from the Conex defendants that may have violated the agreed injunction, and (2) Jeremy was procuring trencher parts for Tech Con.[112] Those inferences, Defendants argue, should have put Trench Tech on notice of any tortious interference as early as 2014.

Defendants' evidence is insufficient to warrant summary judgment on the tortious interference claim. The messages arguably establish that Trench Tech was aware that the Conex defendants might be selling Trench Tech parts in violation of the agreed injunction.[113] But the messages do not demonstrate that Tech Con was purchasing those parts. By 2015, Trench Tech knew that Jeremy was procuring some parts for Tech Con, but Trench Tech still did not know that Jeremy was employed by Tech Con. Defendants do not provide the kind of evidence which support the inference that Trench Tech should have known that Jeremy was procuring any forbidden parts for Tech Con as a matter of law. Again, Defendants' argument relies on a chain of inferences that must be drawn, at this stage, in Trench Tech's favor.

### D.  Breach of Fiduciary Duty

Finally, Defendants move for summary judgment on Trench Tech's breach-of-fiduciary-duty claims. Trench Tech asserts a claim against Smith for breach of fiduciary duties, and it asserts claims against Tech Con, Conlon, and Smith for conspiracy to have Smith and Jeremy breach their fiduciary duties.[114] Defendants argue that they are entitled to summary judgment on Trench Tech's breach-of-fiduciary-duty claims because (1) Trench Tech cannot establish a fiduciary relationship with Smith or Jeremy, and (2) the claims are barred by the statute of limitations.

---

[112] Defs.' 2d Am. Summ. J. Br. 55–56, ECF No. 426.

[113] Defs.' App. pt. 3, at 71, ECF No. 314-2 ("We have not had much luck getting someone to respond to our RFP for 2300 cylinder parts. I think the guy in Grand Prairie is quoting some one else the parts because he has been kinda dragging his feet and acting kinda strange.").

[114] 4th Am. Compl. 29–30, ECF No. 249.

First, Defendants argue that Trench Tech cannot establish a fiduciary relationship. Under Texas law, "[a]n informal relationship may give rise to a fiduciary duty where one person trusts in and relies on another, whether the relation is a moral, social, domestic, or purely personal one." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1997). But "to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit." *Id.* Trench Tech has presented sufficient evidence for a jury to find that Smith and Jeremy owed fiduciary duties to Trench Tech. They were longtime employees of the family business and entrusted with confidential material. "Texas courts have long recognized that entrustment of trade secrets gives rise to a fiduciary relationship." *In re Associated Indep. Marketers Inc. of Am.*, 1 F.3d 1237 (5th Cir. 1993) (unpublished table opinion) (collecting cases). Defendants recycle their argument that Smith and Jeremy worked for Trench-Tech, Ltd., not Trench Tech International, and thus they owed no fiduciary duties to Trench Tech International.[115] Once again, Defendants cite no authority restricting fiduciary duties to employer–employee relationships. The formalities of Trench Tech's entity formation do not preclude a jury finding that Smith and Jeremy owed and breached fiduciary duties to Trench Tech.

Second, Defendants argue that Trench Tech's breach-of-fiduciary-duty claims are barred by the statute of limitations. Texas imposes a four-year statute of limitations for claims of breach of fiduciary duty. Tex. Civ. Prac. & Rem. Code § 16.004(a)(5). The discovery rule likewise applies. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988). Defendants, citing only prior sections of their brief, argue Trench Tech should have discovered the breach of fiduciary duties for the same reasons it should have discovered the misappropriations.[116] The Court has extensively

---

[115] Defs.' 2d Am. Summ. J. Br. 56–57, ECF No. 426.
[116] *Id.*

discussed and rejected those arguments.[117] Defendants have thus failed to show they are entitled to summary judgment on Trench Tech's breach-of-fiduciary-duty claim and the related conspiracy claims.[118]

## IV.   CONCLUSION

Defendants move for summary judgment on every claim. But the voluminous record reveals numerous disputes of material fact on each claim. The Court thus **DENIES** Defendants' motion for summary judgment. Defendants also lodged extensive objections to Trench Tech's evidence. The Court directly addressed the most salient objections, but to the extent the Court relied on other portions of the record to which Defendants objected, those objections are **OVERRULED**.

**SO ORDERED** this **6th day** of **June, 2022**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[117] *See supra* Section III.A.
[118] Because the conspiracy claim is derivative of the underlying tort, courts apply the statute of limitations of the underlying tort to the conspiracy claim. *Agar Corp. v. Electro Cirs. Int'l*, 580 S.W.3d 136, 138 (Tex. 2019).